**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WILMINGTON TRUST COMPANY**, | ) | |
| as Trustee and on behalf of all record | ) | |
| holders and beneficial owners of | ) | |
| 1991 A Bonds, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:05cv1737 |
| | ) | **Electronic Filing** |
| **COUNTY OF ALLEGHENY**, | ) | |
| **ALLEGHENY COUNTY INDUSTRIAL** | ) | |
| **DEVELOPMENT AUTHORITY,** and | ) | |
| **ALLEGHENY COUNTY AIRPORT** | ) | |
| **AUTHORITY,** | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

## I.   INTRODUCTION

Plaintiff, Wilmington Trust Company ("Wilmington Trust"), filed a four (4) count complaint raising state law claims of breach of contract, trespass and possession against Defendants, Allegheny County Industrial Development Authority ("ACIDA"), the County of Allegheny (the "County"), and the Allegheny County Airport Authority (the "Airport Authority")(collectively "Defendants").  Wilmington Trust has filed a motion for partial summary judgment, and the Defendants have filed motions for summary judgment.  Responses have been filed, and the matters are now before the Court.

## II.   STATEMENT OF THE CASE

In 1980, the County entered into a Ground Lease Agreement (the "Ground Lease") with the National Transportation Center (the "NTC") under which the County leased certain real property at the Pittsburgh International Airport (the "Airport") as well as all its right title and interest in certain facilities to be constructed on the leased property. Pretrial Stipulation ¶ 5. The 1980 Ground Lease, which was to expire on December 20, 2001, contemplated that the leased property, including the facilities to be constructed thereon, were to be the subject of a

sublease by the NTC to US Airways, Inc. ("US Air").  Pretrial Stipulation  ¶ 6, County's and Airport Authority's Statement of Undisputed Material Facts ¶ 2 (hereinafter "County's SUMF").  The County's consent to sublease, however, did not "vary or modify the terms, covenants and conditions to be observed and performed by NTC and [US Air] pursuant to [the] Lease." *See* County's Appendix in Support of Motion for Summary Judgment, Exhibit 1 - Ground Lease ¶ 1(b)(hereinafter "Ground Lease").  The Ground Lease provided that, at the time of execution of the Ground Lease, the sublease between NTC and US Air would be executed, and US Air would assume all rights, privileges and obligation of NTC thereafter. *See* Ground Lease ¶ 1(b).  Further, the County had the right to terminate the Ground Lease upon an uncured "Event of Default," including the filing of a voluntary petition in bankruptcy by US Air.  *See* Ground Lease ¶ 21(a)(I).

Construction of the facilities to be leased by US Air in accordance with the 1980 sublease, a maintenance hangar and a jet engine assembly building, was financed in part by a series of revenue bonds (the "1980 bonds"). County's SUMF ¶ 3, Pretrial Stipulation  ¶ 3. Payments on the 1980 bonds were to be derived from the sublease of the hangar, Hangar 5, from NTC to US Air.  Pretrial Stipulation  ¶ 8.  In 1991, the County and the NTC executed an Amendment to the Ground Lease which gave NTC the right, subject to certain terms and conditions and at the direction of US Air, to extend the term to March 1, 2021.  Pretrial Stipulation ¶¶ 14 & 15.  The NTC, with the County's consent, then assigned all its right, title and interest in the Ground Lease to ACIDA.   Pretrial Stipulation ¶ 16.  At the same time, ACIDA entered into a Sublease and Security Agreement (the "Sublease") with US Air under which US Air was to sublease the property and facilities. County's SUMF ¶ 24.  The Sublease incorporated all the terms, conditions and covenants of the Ground Lease.  *Id.*  Pursuant to the Sublease, US Air was obligated, no later than August 22, 2001, to direct the ACIDA to exercise its right to extend the term of the Ground Lease to March 1, 2021.  Pretrial Stipulation ¶ 18.

In June of 1991, the ACIDA refinanced the 1980 bonds by issuing Airport Special

Facilities Revenue Refunding Bonds, Series 1991A (the "1991A Bonds). Complaint ¶ 31. The

1991A Bonds were issued pursuant to a Trust Indenture dated June 1, 1991, entered between

ACIDA and Wilmington Trust as Trustee. Complaint ¶ 32. The Official Statement, published

in connection with the issuance of the 1991A Bonds, provides:

> The 1991A Bonds will be secured by an assignment of all right, title and interest of the [ACIDA] in and to the 1980 Ground Lease and the 1991A Sublease . . . Payments of rent by [US Air] under the 1991A Sublease will be sufficient, together with the other funds available for such purpose, to provide for payment of the principal of and premium, if any, and interest on the 1991A Bonds at or prior to their maturity. The obligation of [US Air] to make payment of such rent pursuant to the 1991A Sublease is absolute and unconditional.

Complaint ¶ 37.

In recognition that bonds were to be issued to finance construction of certain facilities at

the Airport, the Ground Lease authorized ACIDA to assign its interest in the Ground Lease "to

the Trustee as security under the Trust Indenture for the payment of the principal of, and

premium if any, and interest on the Bonds . . ." *See* Ground Lease ¶ 30(c). In accordance with

the Trust Indenture, ACIDA granted, conveyed and assigned to Wilmington Trust all its right,

title and interest in the Ground Lease and the Sublease. Complaint ¶ 45, ACIDA's Statement

of Undisputed Material Facts ¶ 22 (hereinafter "ACIDA's SUMF"). The County was not a

party to the Trust Indenture. *See* County's Appendix in Support of Motion for Summary

Judgment, Exhibit 7 - The Trust Indenture (hereinafter "Trust Indenture").

Under the Trust Indenture, the principal of and premium, if any, as well as the interest

on the 1991A Bonds were payable "solely out of the Revenues . . . and shall not be general

obligations of the [ACIDA] and shall never constitute or give rise to a pecuniary liability of the

[ACIDA], the County or the Commonwealth of Pennsylvania or any political subdivision

thereof." Trust Indenture § 2.01. Pursuant to the Sublease, US Air agreed to make semi-

annual rental payments to Wilmington Trust in an amount sufficient to pay, when due, the

principal and interest on the 1991A Bonds. Pretrial Stipulation ¶ 34, ACIDA's SUMF ¶ 20.

On or about September 23, 1999, the County transferred all of its interests, rights and obligations with regard to the Airport, including the land and facilities subject to the Ground Lease, to the Airport Authority. Pretrial Stipulation ¶ 35, Complaint ¶ 49.

On or about August 11, 2002, US Air filed a voluntary petition in bankruptcy pursuant to Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia. Pretrial Stipulation ¶¶ 36 & 37. Under Paragraph 21(a)(I) of the Ground Lease, US Air's filing constituted an Event of Default. *See* Ground Lease ¶ 21(a). Wilmington Trust was a creditor of US Air and was informed of the bankruptcy on or about August 11, 2002. Pretrial Stipulation ¶ 67. Wilmington Trust issued a notice to the holders of the 1991A Bonds dated August 14, 2002, advising that US Air's filing of a bankruptcy petition was an Event of Default under the Trust Indenture, and therefore the bondholders were entitled to exercise certain rights and remedies as set forth in the Trust Indenture. *See* County's Appendix in Support of Motion for Summary Judgment, Exhibit 23.

In the course of the bankruptcy, US Air filed a Notice of Designation of Unexpired Leases and Executory Contracts which gave notice that it was rejecting the Ground Lease and the Sublease effective January 5, 2004. *See* County's Appendix in Support of Motion for Summary Judgment, Exhibit 27. Wilmington Trust issued a notice to the holders of the 1991A Bonds dated April 8, 2003, stating that US Air had filed "a notice of designation of over 100 leases and contracts relating to the Pittsburgh Airport, including the 1991A Sublease, which were being rejected on the earlier of their normal expiration date or January 5, 2004." *See* County's Appendix in Support of Motion for Summary Judgment, Exhibit 28. On March 16, 2003, the United States Bankruptcy Court for the Eastern District of Virginia confirmed US Air's Plan of Reorganization effective March 31, 2003. Pretrial Stipulation ¶ 37.

As a result of US Air's bankruptcy and rejection of the Ground Lease, the Airport Authority, by letter dated December 17, 2003, asked ACIDA to waive the required thirty (30) day prior written notice provision required to terminate the Ground Lease. Complaint ¶ 52;

ACIDA's Appendix in Support of Motion for Summary Judgment (hereinafter "ACIDA Appx."), Exhibit 13. By letter dated January 2, 2004, ACIDA waived the thirty (30) day notice requirement under the Ground Lease and agreed that the Amended Ground Lease would be terminated effective 12:02 a.m. on January 5, 2004. Complaint ¶ 53; ACIDA Appx. Exhibit 15.

On January 6, 2004, the Airport Authority notified Wilmington Trust that because the Ground Lease had never been extended, and because US Air had rejected the Ground Lease in the bankruptcy proceedings, the Ground Lease was terminated. Complaint ¶ 54. On January 5, 2004, the Airport Authority and US Air entered into a Hangar Facility Lease Agreement (the "2004 Lease") under which the premises which were subject to the Amended Ground Lease and the 1991A Sublease and Security Agreement were leased to US Air for a period of three (3) years[1]. Complaint ¶ 55. No reference to the 1991A Bonds was made in the 2004 Lease, nor was any provision made for the payment of rents and revenues to the Trustee, Wilmington Trust, for payment in turn to the bondholders. *Id.*

III. LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to FED. R. CIV. P 56(c), summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. To support denial of summary judgment, an issue of fact in dispute must be both genuine and material, *i.e.*, one upon which a reasonable fact finder could base a verdict for the non-moving party and one which is essential to establishing the claim. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Id.* The court's consideration of the facts must be in the light most favorable to

---

[1] The 2004 Lease expired in January 2007. US Air and the Airport Authority entered into a new lease (the "2007 Lease") which is presently in effect until December 31, 2010.

the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well. *Whiteland Woods, L.P. v. Township of West Whiteland*, 193 F.3d 177, 180 (3d Cir. 1999), *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987).

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P 56(e). Further, the nonmoving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F. 3d 639, 643 n. 3 (3d Cir. 1998), *quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994).


## IV.    DISCUSSION

### A.    Trespass Action Against the County and the Airport Authority

At Count III of its Complaint, Wilmington Trust alleges an action in trespass against the County and the Airport Authority based upon Wilmington's alleged security interest in the Ground Lease, and a leasehold interest in the premises and facilities conveyed under the Amended Ground Lease. In support of its claims, Wilmington Trust further alleges that the County and the Airport Authority denied Wilmington's interest under the Ground Lease and Amended Ground Lease, and have "taken action inconsistent with ACIDA's and [Wilmington's] rights as lessee under the Amended Ground Lease." *See* Complaint ¶ 74.

Because Wilmington's trespass claim arises from alleged breach of duties under the Ground Lease and Amended Ground Lease, the County and the Airport Authority argue that this claim must be dismissed under the "gist of action[2]" doctrine.

Under the "gist of action" doctrine, a plaintiff is precluded from recovering in tort for claims that actually sound in contract. The doctrine bars tort claims: (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract. *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 19 (Pa. Super. 2002). The doctrine is "designed to maintain the conceptual distinction between breach of contract claims and tort claims." *Id.* at 14.

The purpose of the "gist of action" doctrine is to preclude plaintiffs from pleading ordinary breach of contract claims as tort claims. *Id.* The difference between the two has been explained as follows:

> Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals . . . . To permit a promisee to sue his promisor in tort for breaches of contract inter se would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of actions.

*Bash v. Bell Tel. Co.*, 601 A.2d 825, 829 (Pa. Super. 1992) (citing *Iron Mountain Sec. Storage Corp. v. Am. Specialty Foods, Inc.*, 457 F. Supp. 1158 (E.D. Pa. 1978)). In determining whether the "gist of the action" doctrine applies then, a court must determine whether the source of the duties breached were intertwined with obligations under the contract, or if they

---

[2]    Although the Pennsylvania Supreme Court has never adopted the gist of the action doctrine, the Pennsylvania Superior Court and the Court of Appeals for the Third Circuit, as well as a number of United States District Courts, have predicted that it would. *Williams v. Hilton Group PLC*, 93 Fed. Appx. 384, 385 (3d Cir. 2004); *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 14 (Pa. Super. 2002); *Air Products and Chemicals, Inc. v. Eaton Metal Products Co.*, 256 F. Supp. 2d 329 (E. D. Pa. 2003).

were merely collateral. *Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc.*, 40 F. Supp. 2d 644, 651 (W.D. Pa. 1999).

If, in fact, the County and the Airport Authority owed any duty to Wilmington Trust based upon Wilmington's alleged interest in the premises and facilities at issue in this action, such duties clearly arise out of the myriad of transactions and written agreements set forth in the Complaint, particularly the Ground Lease and the Amended Ground Lease. Any claims Wilmington may have against the County and the Airport Authority must arise from a breach of duties imposed as a matter of contract.

The Court finds Wilmington Trust's tort claim is "inextricably intertwined" with the alleged failure to perform certain obligations under the terms of the contract, *i.e.*, the Ground Lease and the Amended Ground Lease. The Court cannot find the contracts to be merely collateral, but rather finds that contract issues are at the heart of the tort claim. Accordingly, the Court finds that Wilmington's trespass claim alleged at Count III is barred by the gist of the action doctrine.

> B.      Wilmington Trust's Action on the 1991A Bonds Against ACIDA

By this action, Wilmington Trust seeks a declaration that ACIDA is generally liable on the !991A Bonds and/or an award of the outstanding principal of and accrued interest on the bonds. Wilmington Trust also seeks summary judgment on the issue of ACIDA's liability on the bonds. ACIDA contends that it is entitled to summary judgment on Wilmington's claim because the express terms of the Trust Indenture, and the bonds themselves exclude ACIDA from all liability for principal and interest on the bonds.

Under § 2.01 of the Trust Indenture, the obligations of ACIDA, as well as the County, were limited as follows:

> The principal of and premium, fn any, and interest on the Bonds shall be payable solely out of the Revenues . . . and shall not be general obligations of the [ACIDA] and shall never constitute or give rise to a pecuniary liability of the [ACIDA], the County or the Commonwealth of Pennsylvania or any political subdivision thereof.

Trust Indenture § 2.01. The 1991A Bonds also specifically state that the bonds are not an obligation of the County or any political subdivision thereof, and nor is such an entity liable for the payment of principal or interest on the bonds. Pretrial Stipulation ¶¶ 47-49.

The principal and interest on the 1991A Bonds were payable solely from the rental revenues to be paid by US Air under the Sublease[3]. ACIDA's SUMF ¶ 5. Further, in accordance with the Trust Indenture, ACIDA assigned to Wilmington Trust all its right, title and interest in the Ground Lease and the Sublease. ACIDA's SUMF ¶ 22. Pursuant to the Sublease, US Air agreed to make semi-annual rental payments directly to Wilmington Trust. Pretrial Stipulation ¶ 34, ACIDA's SUMF ¶ 20.

Under Pennsylvania's Industrial Development Authority Law (the "Act"), 73 PA. STAT. §§ 371 *et seq.*, ACIDA has authority to issue bonds, the principal and interest on which "are payable exclusively" from the income and revenues from designated projects. 73 PA. STAT. § 377(a)(I) & (ii). Moreover, it is generally understood that "a revenue bond is repaid solely from the revenues generated by the facilities constructed with bond proceeds. In the issuance of this type of bond, the political subdivision acts solely as a conduit for issuing the bonds. It has no obligation to use its tax revenues to finance any shortfall." *See Steele v. Indus. Dev. Bd.*, 301 F.3d 401, 414 (6th Cir. 2002); *see also Benton, Benton & Benton v. Louisiana Public Facilities Authority*, 897 F.2d 198, 201 (5th Cir. 1990)("The Authority has no taxing power and issues revenue bonds for projects to be constructed and operated by others. The bonds are to be repaid from the revenues of the project and, although the bonds are issued in the Authority's name, it assumes no responsibility for repayment . . ."); *Basehore v. Hampden Industrial Dev. Authority*, 248 A.2d 212, 220 (Pa. 1968)("revenue bonds are quite common . . . and purchasers of such bonds are well aware that they cannot look to the Commonwealth or any political subdivision for security."); *Appeal of German*, 366 A.2d 311 (Pa. Commw. 1976).

_____

[3] The Trust Indenture specifically references the Sublease US Air entered into with the "Authority" dated as of June 1, 1991. Trust Indenture pp. 2 & 10.

Based upon the express language of the Trust Indenture and the 1991A Bonds, as well as Pennsylvania statute, the payment of principal and interest on the 1991A bonds is not the general obligation of either ACIDA or the County. Moreover, Wilmington Trust was aware, or should have been aware, that payment on the revenue bonds at issue was limited to the rental revenues generated under the Sublease. Though Wilmington Trust acknowledges the express limit of ACIDA's liability under the Trust Indenture, it argues that under Pennsylvania law ACIDA cannot rely upon a limitation of its obligation for payment because ACIDA breached its duty to the bondholders by failing to assure the adequacy of the source of payments on the bonds. In support of its contention, Wilmington Trust relies upon a line of cases culminating in *Nagle Engine & Boiler Works v. City of Erie*, 38 A.2d 225 (Pa. 1944). ACIDA argues that the holding and rationale of *Nagle Engine* is inapplicable to conduit-issued revenue bonds as the Pennsylvania Supreme Court in *Nagle Engine* specifically addressed improvement bonds[4] issued by the City of Erie. For the reasons set forth below, the Court finds that even if *Nagle Engine* is applicable in this instance, and the Court finds it is not, Wilmington Trust fails to show that ACID's conduct breached a duty owed to the bondholders.

In *Nagle Engine*, the City of Erie adopted an ordinance that provided for the paving of certain streets, the cost of which was to be assessed against owners of the lands abutting the improved roadways. *Nagle Engine & Boiler Works v. City of Erie*, 38 A.2d at 225. The City appointed viewers to assess the benefits, and the assessments were to be paid by the landowners in ten installments, the first being due thirty (30) days after the completion of the work. *Id.* The city treasurer was to collect the installments as they become due and provide a certified list of all unpaid assessments to the city solicitor who was then to file municipal claims. *Id.* If any property owner to failed pay the amount of any installment and interest, the treasurer was to request the solicitor to commence the proper action to collect such delinquent

---

[4]     Improvement bonds are bonds issued by a political subdivision payable solely or primarily by funds raised by levying special assessments against property owners who will benefit from the improvements. 64 AM. JUR. 2D § 13 (2001).

assessment. *Id.* The street improvement bonds issued expressly limited payments to "the assessments levied on the lands abutting on the improved highways." *Id.* at 226. When the City failed to collect on the assessments, the bondholder brought an action against the City for the face value of the bonds.

The Pennsylvania Supreme Court in reliance upon a long line of similar cases involving improvement bonds[5], held that, where a city issues municipal improvement bonds with limited liability, it nevertheless makes itself generally liable thereon if it is negligent in enforcing collections of the assessments and liens for the benefit of the bondholders. *Id.* The Court expressly stated that its rationale in holding the City liable on the bonds was based upon the fact that:

> **only the city** [could make and enforce the assessments], and therefore the law writes into these bonds an implied covenant that the city will use due diligence in collecting the liens and if it fails to do so will itself pay the bonds according to their terms with the same force and effect as if they were full faith and credit bonds of the municipality.

*Id.*(Emphasis added). Subsequent to *Nagle Engine*, the Pennsylvania Supreme Court applied this rationale only when enforcing the collection of assessments on improvement bonds against a municipality.

In *Harbold v. Reading*, 49 A.2d 817 (Pa. 1946), there was no failure on the part of the city to make valid assessments, to file liens within the proper times, or to issue the necessary writs to revive the liens. *Harbold v. Reading*, 49 A.2d at 824. Nonetheless, the Court found the city was not relieved of its liability under the covenant implied in the bonds that it would pursue all reasonable measures to effect collection; to press the liens to fruition, to enter

---

[5]    *Addyston Pipe & Steel Co. v. City of Corry*, 46 A. 1035 (Pa. 1900); *Gable v. Altoona*, 49 A. 367 (Pa. 1901); *O'Hard v. Scranton*, 54 A. 713 (Pa. 1903); *Dime Deposit & Discount Bank of Scranton v. Scranton*, 57 A. 770 (Pa. 1904); *Dale v. City of Scranton*, 80 A. 1110 (Pa. 1911); *Nolan v. City of Reading*, 84 A. 390 (Pa. 1912); *Price v. Scranton*, 184 A. 253 (Pa. 1936); *Palmer v. Erie*, 9 A. 2d 378 (Pa. 1939); *Bessemer Investment Co. v. City of Chester*, 113 F. 2d 571 (3d Cir. 1940).

judgments on the liens, to issue writs of execution, and if necessary to expose the properties to sheriff's sales. *Id.* The city's failure to exhaust all possible measures to effect collections from the property owners was found to be negligent and the city was therefore liable for the payment of the principal and interest of the bonds despite the bonds' express limitation on payment to the assessments against property owners benefitting from the improvements. *Id.* at 825.

Similarly, in *Miller v. Reading*, 87 A.2d 223, 225 (Pa. 1952), the city issued improvement bonds which expressly provided: "[t]his bond, principal and interest, . . . is payable only out of the assessments made and levied upon the properties benefitted by the local improvement (street improvement) for which this bond is issued and from no other fund." *Miller v. Reading*, 87 A.2d at 224. The City admitted that it negligently failed to collect the assessments, and the Court held, citing *Nagle Engine*, "where a city issues municipal improvement bonds with limited liability, it nevertheless makes itself generally liable thereon if it is negligent in enforcing collections of the assessments and liens for the benefit of the bondholders." *Id.* at 225.

Each of the above-cited cases are specific to improvements and the assessing authority's duty to enforce its assessment for the benefit to the bondholder. This Court will not expand the holding of *Nagle Engine* and its progeny to cover revenue bonds. To do so would nullify the exclusion of liability of issuers of revenue bonds that is statutorily sanctioned by the Commonwealth of Pennsylvania. Moreover, the rationale of *Nagle Engine* was specifically based upon the municipality's singular authority to assess the benefitting property owners and enforce the assessments. Here, ACIDA had no such duty to assess and collect the revenues from which the payments on the 1991A Bonds were to be made. Pursuant to the Sublease, US Air agreed to make semi-annual rental payments directly to Wilmington Trust. Moreover, in accordance with the Trust Indenture, ACIDA assigned to Wilmington Trust all its right, title and interest in the Ground Lease and the Sublease. Wilmington Trust, therefore, had the right, as well as the duty, to enforce the collection of rental revenue from US Air and thereby protect

the interests of the bondholders.

Further, Wilmington Trust is, or should be, sophisticated in the business of public securities and the obligations related thereto. It knew, or should have known, the rights and obligations of issuers and holders of general obligation bonds, improvement bonds and revenue bonds, as well as the specific resources from which such bonds are to be paid. Like many other jurisdictions, Pennsylvania expressly authorizes the issuance of revenue bonds, and specifically limits the payments of principal and interest thereon to the income and/or revenues from designated projects. *See* 73 PA. STAT. §§ 371 *et seq.* As fiduciary to the holders of the 1991A Bonds, Wilmington Trust had the duty to diligently protect to the revenue stream relevant to payment, and though it had such opportunity[6], it simply failed to do so.

Even if this Court found the rationale of *Nagle Engine* applicable to the revenue bonds issued herein, Wilmington Trust is unable to show that ACIDA owed a specific duty to the bondholders, that ACIDA was in breach of the duty or that such breach caused the loss of the bond's revenue source.

Wilmington Trust contends that ACIDA breached its obligations under the Trust Indenture by failing to assure that the terms and conditions of the Ground Lease and the Sublease were enforced, and by failing to protect the security for the bonds. Specifically, Wilmington Trust argues that ACIDA acquiesced in the Airport Authority's termination of the Ground Lease without notice to Wilmington Trust, by waiving both ACIDA's and Wilmington's alleged notice rights. This argument is without merit.

Notwithstanding Wilmington's complete failure to show ACIDA's duty to the bondholder's under the Ground Lease or Sublease, such alleged waiver of notice rights did not

---

[6] Wilmington Trust, a creditor of US Air, was informed of US Air's bankruptcy on or about August 11, 2002. Wilmington Trust then issued a notice to the holders of the 1991A Bonds dated August 14, 2002, advising that US Air's filing of a bankruptcy petition was an Event of Default under the Trust Indenture, and therefore the bondholders were entitled to exercise certain rights and remedies as set forth in the Trust Indenture. Pretrial Stip. ¶ 27.

cause the termination of the 1991A Bonds' revenue source. Pursuant to its rights under Section 365 of the United States Bankruptcy Code, US Air rejected the Ground Lease and the Sublease effective January 5, 2004. Section 365(a) gave US Air the right to walk away from its obligations[7] before the end, or perceived end, of such contracts, thus converting Wilmington Trust's entitlements under the contracts to a claim or claims for damages. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984). It is undisputed that Wilmington Trust was aware of US Air's rejection of the Sublease as of April 8, 2003, when it issued a notice to the holders of the 1991A Bonds stating that US Air had rejected "over 100 leases and contracts relating to the Pittsburgh Airport, including the 1991A Sublease." The Airport Authority asked ACIDA to waive the thirty (30) day notice provision required to terminate the Ground Lease[8] on December 17, 2003. This had no affect on the rejection of the Sublease, the sole source of revenue for the payment of principal and interest on the 1991A Bonds.

Wilmington Trust also argues that if the Ground Lease was not extended by US Air, ACIDA may be held responsible for such failure. Specifically, it contends that ACIDA's limitation of its liability to a particular fund fails, if the source of the funds becomes unavailable because of ACIDA's fault or negligence. The Court can find no fault or negligence on the part of ACIDA for US Air's failure to extend.

The Ground Lease between the NTC and the County was scheduled to expire on December 20, 2001. Pretrial Stip. ¶ 6. In connection with the 1991A Bond issue, the County and the NTC entered into an amendment to the Ground Lease on July 8. 1991. Pretrial Stip. ¶ 14. The amendment gave NTC the right to extend the term of the Ground Lease, at the

---

[7] The decision to reject an executory contract is a matter solely within the sound business judgment of the debtor. *See, e.g., In re Taylor*, 913 F.2d 102 (3d Cir. 1990).

[8] There is an issue whether such notice was necessary, as the Defendants argue US Air failed to exercise its right to extend the term of the Ground Lease, and as such the lease expired on December 20, 2001. The Court will specifically address the extension issue in Subsection (IV)(C) of this Memorandum Opinion.

direction of US Air, through March 1, 2021, the maturity date of the 1991A Bonds. Pretrial

Stip. ¶¶ 14 & 15. US Air was obligated to direct the extension by August 22, 2001. *Id.* The

Amended Sublease specifically states:

> NTC shall have the right to extend the term hereof until March
> 21, 2021, . . . [which] right to extend shall be exercised by NTC,
> upon the direction of [US Air], by the provision to the County of
> notice of intent to extend the term . . . no later than 120 days
> prior to the expiration of the initial term hereof.

Amendment to Ground Lease Section 1(e)(I). The expiration date of the initial term of the

Ground Lease was December 20, 2001. In addition, the County consented to NTC's

assignment of its right to extend to US Air. Amendment to Ground Lease Section 1(f). NTC

assigned all of its rights under the Ground Lease to ACIDA. Pretrial Stip. ¶ 16. Pursuant to the

Sublease entered between, ACIDA and US Air, US Air was also obligated to direct ACIDA to

exercise ACIDA's right under the Sublease to extend the term of the Ground Lease to March 1,

2021. Pretrial Stip. ¶ 18. ACIDA, pursuant to the 1991 Trust Indenture, then assigned all of its

right, title and interest in the Ground Lease and the Sublease to Wilmington Trust. Trust

Indenture pp. 2-3.

Assuming there was no extension of the Ground Lease at the closing of the 1991A

Bonds, it was Wilmington Trust's duty to assure such extension was express and made with the

formality required under the specific contracts. If the right to extend was not formally

exercised at the closing, the benchmark date to extend for the ultimate protection of the

bondholders was August 22, 2001, provided there were bonds outstanding at that time.

Notwithstanding Wilmington Trust's argument regarding Section 10.05 of the Trust

Indenture that it was not "required to take notice" of any event of default other than a failure of

payment by US Air, Wilmington Trust as assignee of ACIDA's rights under the Sublease was

in a position to protect the rights of the holders of any outstanding bonds and cannot disavow

its responsibility to those bondholders. Clearly, a failure by US Air to direct extension was an

Event of Default under the Sublease. *See* Sublease § 10.1(b). The Sublease gave Wilmington

Trust certain remedies in the Event of Default, including a right to accelerate the maturity of the 1991A Bonds and the right to terminate US Air's possession of the premises. *See* Sublease § 10.2(a) & (b). Wilmington Trust failed to exercise any of the remedies available under the Sublease. Moreover, there is no evidence in the record that indicates Wilmington Trust relied upon any express, formal direction to extend made by US Air, or any other party herein, in its failure to exercise its remedies for an Event of Default.

Finding that ACIDA owed no duty to the bondholders with regard to the extension of the Ground Lease, there can be no finding of negligence by ACIDA for the failure of Wilmington's security on the 1991A Bonds. Therefore, even assuming that *Nagle Engine* is applicable, Wilmington's claim on the bonds fails against ACIDA.

Based on the foregoing, summary judgment will be entered in favor of ACIDA and against Wilmington Trust on Wilmington Trust's action on the 1991A Bonds. Wilmington Trust's motion for partial summary judgment contending ACIDA is generally liable on the bonds notwithstanding the limitation of its liability in the Bond Indenture and bond provisions will be denied.

        C.      Breach of Contract Claim Against the County and the Airport Authority

Wilmington Trust and both the County and the Airport Authority ("County Defendants") have cross-motioned for summary judgment on Wilmington Trust's breach of contract, trespass and possession claims. The Court has determined that the trespass claim fails as a matter of law. Based on the reasons set forth below, the Court finds that Wilmington Trusts breach of contract claim against both the County and the Airport Authority shall be dismissed as a matter of law. Having failed on its breach of contract claim, Wilmington has no right to possession of the premises at issue and judgment shall also be entered for Defendants and against Wilmington on the claim for possession.

Wilmington Trust contends that the term of the Ground Lease was extended to March 1, 2021, at the closing on the 1991A Bonds. Therefore, the County Defendants breached the

Ground Lease by improperly terminating the lease in December of 2003. The County Defendants, however, maintain that there is a complete lack of evidence that suggests US Air intended to exercise its right to extend the Ground Lease at the time of the closing.

Acknowledging the absence in the record of any formal expression by either US Air or ACIDA of the exercise of the right to extend the Ground Lease to March 1, 2021, Wilmington Trust relies upon the following as evidence the Ground Lease was in fact extended:

1. Conduct and informal notice was sufficient to establish an intent to exercise the right to extend;

2. The "Official Statement" from the 1991 closing contains clear notice of intent to exercise the right to extend;

3. The documents delivered at the 1991 closing establish that the term of the Ground Lease was extended; and

4. The post-closing conduct of the County Defendants and ACIDA establish that the right to extend was exercised at the closing.

The Court finds such reliance unfounded.

1. <u>Extension by Conduct and/or Informal Notice</u>

Wilmington Trust argues that the absence of a formal expression of notice of intention to extend the Ground Lease is not fatal to its contention that the Ground Lease was extended at the 1991 closing because under Pennsylvania law, acceptance of an option to extend a lease "may be indicated by any act, expression or course of conduct, without formal notice to the lessor, unless required by the terms of the contract." *White v. Long*, 137 A. 673, 676 (1927).

Though this an accurate statement of the law, it fails on two fronts. First, Wilmington Trust fails to direct this Court to any "act, expression or course of conduct" that manifested an exercise of the extension by US Air. The purported act relied on by Wilmington appears to be a statement in Appendix B to the Official Statement that US Air "will exercise" the option to extend at the time of the closing. In addition to being a violation of the parol evidence rule, such statement was not made by US Air or a representative of US Air. Nor was such statement made to the County as lessor under the Ground Lease; the County was not a party to the 1991 bond closing.

Further, an "act, expression or course of conduct" may act as an exercise of an

extension unless formal notice is "required by the terms of the contract." Here the contracts at issue provide explicit formal notice requirements. The 1991 amendment to the Ground Lease provides that the right to extend shall be exercised "by the provision to the County of notice of intent to extend the term . . . no later than 120 days prior to the expiration of the initial term . . ." Amendment to Ground Lease Section 1(e)(I). The amendment further states that "[i]n all other respects, the terms, conditions and other provisions of [the Ground Lease] shall remain the same." Amendment to Ground Lease Section 4. Article 34 of the Ground Lease explains how such notice shall be given to the County.

Further, under the Sublease entered into between ACIDA and US Air, US Air agrees to "exercise [ACIDA's] right to extend the term of the Ground Lease as provided in [] Section 2(e) of the Ground Lease. Such action must be taken no later than 120 days prior to the expiration of the initial term of the Ground Lease." Sublease and Security Agreement Section 8.2. Any notices or requests to be made under the Sublease were "deemed given when mailed by registered mail, postage prepaid . . . A duplicate copy of each notice, certificate, request or other communication given by US Air hereunder shall also be given to [Wilmington Trust] and [ACIDA]." Sublease and Security Agreement Section 12.1. The right to extend in the amendment to the Ground Lease could only be exercised by formal notice, and any "act, expression or course of conduct" was ineffective to exercise the right to extend.

Wilmington Trust also argues that though the extension provision specified a required form of formal notice, the landlord by its conduct may waive the right to insist on a specific form of notice. *See e.g. May Department Store Co. v. Opus One, Inc.*, 33 B.R. 190, 193-194 (Bankr. W.D. Pa. 1983. There is no evidence in this record, however, that would allow this Court to find equitable grounds for waiving the formal notice requirements expressly set forth in the several contracts governing the right to extend the Ground Lease.

2.      Documents Delivered at Closing as Notice of Intent to Extend

As part of the offering of the Bonds, ACIDA issued an "Official Statement" dated July 3, 1991. With regard to the Ground Lease, Appendix B to the Official Statement stated:

At the closing of the sale of the 1991A Bonds, NTC will assign

> to [ACIDA] the 1980 Ground Lease and the Amendment to the
> Ground Lease which further grants the option to extend the
> Ground Lease. [ACIDA] will assign to US Air its right to
> exercise the option to extend the term of the 1980 Ground Lease,
> and US Air will exercise such option at the closing of the sale of
> the 1991A Bonds.

*See* Wilmington Trust Ex. C, p. B-13. Wilmington Trust contends that the above statement is a

clear statement of intention to exercise the lease extension as a condition to the issuance of the

Bonds. In addition to the Official Statement, Wilmington Trust relies upon: the Certificate of

Issuer; the Certificate of US Air, Inc.; Memorandum of Sublease; opinion of co-counsel to

ACIDA; Supplemental Letter of Bond Counsel; and Opinion Letter of Counsel to Underwriter.

The County Defendants argue, however, that unless the Ground Lease, amendment to

the Ground Lease and the Sublease are ambiguous with regard to the parties intent, the Official

Statement is barred by the parol evidence rule, and the other documents delivered at the 1991A

Bond closing fail to evidence US Air's alleged extension of the Ground Lease at the closing.

Where the language of the contract is clear and unambiguous, the focus of the Court's

interpretation must be upon the terms as "manifestly expressed, rather than as, perhaps, silently

intended." *See Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982). This Court will interpret

the express terms of the several agreements to ascertain and give effect to the parties' intent.

*See generally Laudig v. Laudig*, 624 A.2d 651, 653 (Pa. Super. 1993); *see also Krizovensky v.*

*Krizovensky*, 624 A.2d 638, 642 (Pa. Super. 1993)(citing *Steuart v. McChesney,* 444 A.2d 659

(Pa. 1982)).  Moreover, in construing the agreements, all of the terms must be taken into

account and, if possible, given effect. *See Wrenfield Homeowners Ass'n, Inc. v. DeYoung*, 600

A.2d 960, 963 (Pa. Super. 1991).  Further, this Court must not construe one part of an

agreement so as to annul another provision of the same agreement. *Shehadi v. Northeastern*

*National Bank of PA,* 378 A.2d 304, 306 (Pa. 1977);  *Second Federal Sav. and Loan Ass'n v.*

*Brennan*, 598 A.2d 997, 999 (Pa. Super. 1991).

"The making of a contract depends not on the agreement of two minds, in one intention,

but on the agreement of two sets of external signs -- not on the parties having meant the same

thing but on their having said the same thing." *Mellon Bank, N.A. v. Aetna Business Credit*, 619 F.2d 1001, 1009 (3d Cir. 1980)(citation omitted). Moreover, "when parties to a contract have reduced their agreement to writing, that writing will be the sole evidence of their agreement, and parol evidence may not be admitted to vary the terms of the contract in the absence of fraud, accident or mistake." *Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 994 (3d Cir. 1987). A writing represents the entirety of the agreement between the parties if "it appears to be a contract complete within itself couched in such terms as import a complete legal obligation." *Gianni v. R. Russell & Co.*, 126 A. 791, 792 (Pa. 1924).

Pennsylvania's parol evidence rule generally has been described as follows:

> Where the parties to an agreement adopt a writing as the final and complete expression of their agreement, as here, evidence of negotiations leading to the formation of the agreement is inadmissible to show an intent at variance with the language of the written agreement. Alleged prior or contemporaneous oral representations or agreements concerning subjects that are specifically dealt with in the written contract are merged in or superseded by that contract. The effect of an integration clause is to make the parol evidence rule particularly applicable. Thus the written contract, if unambiguous, must be held to express all of the negotiations, conversations, and agreements made prior to its execution, and neither oral testimony, nor prior written agreements, or other writings, are admissible to explain or vary the terms of the contract.

*McGuire v. Schneider, Inc.*, 534 A.2d 115, 117-118 (Pa. Super. 1987)(citations omitted). The Official Statement was dated July 3, 1991, and was therefore made prior to, or contemporaneous with, only the Amendment to the Ground Lease which was dated July 8, 1991. None of the parties to the agreements at issue, however, argue that the terms regarding the right to extend, or any of the relevant provisions of the agreements, are ambiguous. To the extent Wilmington Trust relies upon the Official Statement as evidence there was no intent to give U.S. Air until August 22, 2001, to exercise its right to extend the Ground Lease, the Court finds the Official Statement is barred for such purpose. Moreover, the Amendment to the Ground Lease executed five (5) days after the date of the Official Statement specifically manifests an intention that US Air have until August 22, 2001, to exercise its right extend the

Ground Lease[9].

Wilmington Trust can certainly use the Official Statement as evidence of its contention that US Air exercised to its right to extend the Ground Lease at the closing. The Court, however, finds that the Official Statement is insufficient to show that the extension was indeed exercised. Notwithstanding the legal status of the Official Statement, it is not a definitive statement by US Air, or by ACIDA, of what actually occurred at the closing. Moreover, the Official Statement is not meant to override the actual documents summarized in either the body of the Statement or in the Appendices attached to the Official Statement. In the Official Statement, ACIDA states "The summaries herein and in the Appendices do not purport to be complete and are expressly made subject to the exact provisions of the applicable documents." *See* Wilmington Trust Ex. C, p. 13. Further, though the Official Statement explicitly states that the information in Appendix A was furnished by US Air, it conspicuously fails to similarly state the same for the information set forth Appendix B. "All information contained or incorporated by reference in Appendix A . . . has been furnished by [US Air]." *Id.*

With regard to the Official Statement, as well as the other documents delivered at the closing, the Court agrees with the County Defendants that such documents are not sufficient to serve as proof of US Air's extension of the Ground Lease at the closing date of July 11, 1991. Such documents cannot overcome the express requirements for notice under the Ground Lease and Sublease.

Moreover, both of the representatives of US Air deposed in this case testified that, to their knowledge, the Ground Lease was not extended by US Air. Robert Hazel ("Hazel"), who was employed at US Air from 1983 through 2001, was the senior-most person at US Air with responsibility for issues such as the extension of hangar leases, testified that US Air did not direct ACIDA to extend the Ground Lease while he was at US Air. *See* County Ex. 13, Hazel

---

[9] The Sublease and Security Agreement dated June 1, 1991, but executed on July 11, 1991, also expresses an intent that US Air have until "no later than 120 days prior to the expiration of the initial term" of the Ground Lease to exercise its right to extend.

Depo. pp. 5-6, 10, 41 & 45. Wilmington Trust argues that Hazel lacks personal knowledge of the matters and his testimony is therefore inadmissible under Rule 602 of the Federal Rules of Evidence. Though Hazel was involved in the `1991A Bond transaction, he did not recall attending the closing or reviewing either the bond financing documents, or the Official Statement. Hazel also did not recall whether there was any discussion about extending the lease in 1991. His inability to recall the events regarding the closing in 1991 does not make Hazel's testimony inadmissible. Because he does not recall whether US Air considered extending the lease at the closing does not make it more or less likely the extension was exercised in 1991. However, Hazel specifically testified that, in 2001, he did not consider directing ACIDA to extend the Ground Lease because he did not believe it was in US Air's best interest to do so. *See* Hazel Depo pp. 42-43.

Kirk Hotelling ("Hotelling") testified in the instant case as US Air's 30(b)(6) designee. Wilmington contends his testimony is inadmissible because it is not based upon the personal knowledge of anyone at US Air. Wilmington's argument goes to the weight of Hotelling's testimony, not to the admissibility. Under Rule 30(b)(6), "[t]he persons designated must testify about information known or reasonable available to the corporation." FED. R. CIV. P. 30(b)(6). Hotelling testified that to prepare for his deposition he read through various documents relating to the bond closing, had conversations with counsel, spoke with US Air's treasury department with regard to their knowledge of bonds and bond payments, and spoke with with regard to the plans and general description of the work done at the facilities. Wilmington Trust Supp. Appendix, Ex. 3 Hotelling Depo pp. 46 & 80. Hotelling also testified that to his knowledge US Air did not extend or have the Ground Lease extended. Hotelling Depo p. 61.

The Court gives little weight to the conduct subsequent to the closing as evidence that the Ground Lease had been extended by US Air. Such evidence regarding the assumptions of certain persons, unaffiliated with US Air and unfamiliar with the agreements at issue, made years after the closing, is immaterial to US Air's intent or conduct at the closing of the !991A

Bonds.

Giving all the evidence its proper weight,[10] the Court finds that the Ground Lease was not extended on July 11, 1991. Absent a formal written instrument expressly exercising the right to extend, the Court will not allow a fact-finder to speculate on what was or was not intended by a statement made by ACIDA in Appendix B of the Official Statement. The Court finds no material issue of fact upon which a factfinder could base a finding that US Air exercised its right to extend the Ground Lease at anytime before August 22, 2001.

<div align="center">3. <u>Extension of the Ground Lease by Operation of Law</u></div>

Based on US Air's failure to direct the extension of the Ground Lease, the Ground Lease expired by its own terms on December 20, 2001. US Air, however, remained in possession of the premises and facilities which were the subject of the Ground Lease, and continued to pay ground rent to the Airport Authority at the rates established in the Ground Lease. Based upon this continued possession, Wilmington argues that the Ground Lease was extended to March 1, 2021 by operation of law. The County Defendants contend that by failing to exercise its right to extend and by continuing possession, US Air assumed the status of a month-to-month, or holdover, tenant.

In *Routman v. Bohm*, 168 A.2d 612 (Pa. Super. 1961), the court specifically held that the tenants, who had held over after an expiration of a three-year lease and continued to pay the same monthly rent, became tenants from year to year. The court set forth the following rule of law:

> [W]here following the expiration of a tenancy for a term of one or more years, the tenant with the consent of the landlord holds over, prima facie, in the absence of evidence showing a contrary intent, the normal inference from the conduct of the parties is that they thus exhibited an intent to convert the tenancy into one from year to year.

*Routman v. Bohm*, 168 A.2d at 613-14. The *Routman* court based its holding on the

---

[10]  Including the testimony of Eric Ruprecht.

Pennsylvania Supreme Court's holdings in: *Harvey v. Gunzberg*, 148 Pa. 294, 23 A. 1005 (1892); *Phoenixville Boro. v. Walters*, 147 Pa. 501, 23 A. 776 (1892); *Murtland v. English*, 214 Pa. 325, 330, 63 A. 882 (1906); *Laguerenne v. Dougherty*, 35 Pa. 45 (1860); *Williams v. Ladew*, 171 Pa. 369, 33 A. 329 (1895); *Hemphill v. Flynn*, 2 Pa. 144, 146 (1845).

In *Harvey v. Gunzberg*, *supra.*, the lease was for a term of two years with an option, which was exercised, to renew for three years. After the expiration of the five year term, the tenant continued in possession for five months, and paid the rent. The landlord sued, and recovered rent for the next seven months. The court held that where a tenant holds over after the expiration of his term, and no definite arrangement has been made between the landlord and tenant, tenancy for another year is created. *Harvey v. Gunzberg*, 23 A. at 1005.

The term of the lease involved in *Murtland v. English*, *supra*, was five years, and the Court held: "When he held over after the expiration of the term, without making any new arrangements, the tenancy became one for another year upon the same conditions as before." *Murtland v. English*, 214 Pa. at 330. The terms of the leases in *Williams v. Ladew* and *Phoenixville Boro. v. Walters* were fifteen (15) years and ten (10) years respectively. In both instances the Court found the holdover tenancy to be year-to-year.

The only recent deviation from this rule occurred in *Clairton Corp. v. Geo-Con, Inc.*, 635 A.2d 1058 (Pa. Super. 1993). There, the court noted that the rule of *Routman v. Bohm* expressly provided that a hold over tenant was obligated for an additional year "in the absence of evidence showing a contrary intent." *Clairton Corp. v. Geo-Con, Inc.*, 635 A.2d at 1060. In *Clairton*, the tenant under a two-year lease remained in possession and continued to pay rent following the expiration of the two-year term. The only evidence of a contrary intent to the creation of a tenancy for an additional year was the fact that the parties conducted extensive negotiations for a new lease incorporating the tenant's desire to obtain additional rental space. The court held that the hold over period was on a month-to-month basis. *Id.*

It would appear that US Air was a holdover tenant as defined under Pennsylvania law

subject to a year-to-year tenancy under the Ground Lease. The only evidence that US Air and the County Defendants attempted to negotiate a new agreement occurred after US Air had rejected the Ground Lease and Sublease in bankruptcy. Whether these negotiations would make *Clairton* applicable to the instant matter and convert the holdover tenancy from year-to-year to month-to-month is immaterial. As set forth below, US Air's rejection of the ground Lease and Sublease effectively made the date of termination of the agreements material to Wilmington's claims January 5, 2004. Wilmington Trust's position, however, has no basis in law[11], and contradicts the evidence of US Air's intention not to exercise its right to extend the Ground Lease.

Based on the above, Wilmington Trusts contention that the County Defendants improperly terminated the Ground Lease is without merit. Wilmington contends that the termination was improper because it was taken upon an "unremedied event of default," and that the County Defendants' letter dated December 17, 2003, did not give the proper thirty (30) day notice as required under the Ground Lease.

Wilmington's argument with regard to the termination letter dated December 17, 2003, is a red herring. The fact that the letter was sent to ACIDA requesting a waiver of the thirty day termination notice and terminating the Ground Lease effective January 5, 2004, is of no moment. The Ground Lease was not extended by US Air, and US Air had rejected the Ground Lease in the course of the bankruptcy. Moreover, Wilmington Trust issued a notice to the holders of the 1991A Bonds dated April 8, 2003, acknowledging that "leases and contracts relating to the Pittsburgh Airport, including the 1991A Sublease, . . . were being rejected on the earlier of their normal expiration date or January 5, 2004." Wilmington, therefore, had actual notice as of April 8, 2003, that all US Air's obligations under both the Ground Lease and

---

[11]    In support of its position that the lease was extended to March 1, 2021, Wilmington directs this Court to *United States v. Certain Parcels of Land*, 86 F. Supp. 676 (1949). *Certain Parcels*, however, is inconsistent with Pennsylvania Supreme Court precedent, and this Court can give it no precedential effect in its decision.

Sublease were terminating as of January 5, 2004. In reality, once the Sublease, and hence Wilmington's income stream[12], was rejected by US Air, Wilmington was left with an obligation to the Airport Authority and no sublease to obviate such obligation. If in fact the County Defendants were in technical breach of the notice requirement under the Ground Lease, such breach was not material to any damages suffered by Wilmington and/or the bondholders upon the failure of the source of payment on the 1991A Bonds.

Wilmington also argues that the termination was not based upon the unremedied event of default, as US Air had emerged from Chapter 11 reorganization at the time of the County Defendant's attempted termination of Ground Lease on December 17, 2003. US Air's emergence from bankruptcy, however, did not cure the event of default. The fact of the bankruptcy remained, *i.e.* US Air emerged with no obligation under either the Ground Lease or the Sublease beyond January 5, 2004. Had US Air decided not to reject the agreements and the obligations to Wilmington thereunder, such argument may have a modicum of reason, but US Air did in fact reject the agreements.

The Court, therefore, finds that Wilmington Trust's breach of contract claim against the County Defendants fails and shall be dismissed. As such Wilmington Trust has no right of possession of the premises at issue.

Further, though the Court sees some merit in the Defendants' argument that US Air is an indispensable party under Rule 19 of the Federal Rules of Civil Procedure, based upon its rulings set forth above, it unnecessary to address the issue herein.

## V.    CONCLUSION

Based on the foregoing, the Court will grant the motions for summary judgment filed on behalf of ACIDA, the County and the Airport Authority. Wilmington Trust's motion for

---

[12]    The 1991A Bonds were specific in that the payment of principal and interest was base on the Sublease and Security Agreement dated June 1, 1991. Wilmington could not look to any other future instrument for payment on the bonds.

partial summary judgment shall be denied.  An appropriate order will follow.

<div align="center" style="margin-left:50%">
s/ David Stewart Cercone
David Stewart Cercone
United States District Judge
</div>

cc:    Thomas R. Johnson, Esquire
David M. Aceto, Esquire
J. Nicholas Ranjan
Kirkpatrick & Lockhart Preston
  Gates Ellis LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222-2312

Thomas P. McGinnis, Esquire
Suzanne B. Merrick, Esquire
Karin Romano Galbraith, Esquire
Thomas Thomas & Hafer LLP
One Oxford Centre, Suite 1150
301 Grant Street
Pittsburgh, PA 15219

Mark F. Nowak, Esquire
Stacey L. Jarrell, Esquire
Thorp Reed & Armstrong
One Oxford Centre, 14th Floor
301 Grant Street
Pittsburgh, PA 15219-1425